**EFiled: Jun 02 2022 10:29AM EDT**
**Transaction ID 67683224**
**Case No. 2020-1061-JTL**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STEWART N. GOLDSTEIN, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 2020-1061-JTL |
| ALEXANDER J. DENNER, JOHN G. COX, ANNA PROTOPAPAS, BRIAN S. POSNER, LOUIS J. PAGLIA, GENO J. GERMANO, JOHN T. GREENE, ANDREA DIFABIO, SARISSA CAPITAL MANAGEMENT, L.P., SARISSA CAPITAL DOMESTIC FUND LP, SARISSA CAPITAL OFFSHORE MASTER FUND LP, and SARISSA CAPITAL MANAGEMENT GP LLC, | ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION ADDRESSING
## MOTION TO DISMISS COUNTS III AND IV

Date Submitted: March 4, 2022
Date Decided: June 2, 2022

Kevin H. Davenport, John G. Day, PRICKETT, JONES & ELLIOT P.A., Wilmington, Delaware; R. Bruce McNew, COOCH & TAYLOR P.A., Wilmington, Delaware; Randall J. Baron, David T. Wissbroecker, ROBBINS GELLER RUDMAN & DOWD LLP, San Diego, California; Christopher H. Lyons, ROBBINS GELLER RUDMAN & DOWD LLP, Nashville, Tennessee; Brett Middleton, JOHNSON FISTEL, LLP, New York, New York; *Attorneys for Plaintiff.*

Matthew D. Stachel, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, Wilmington, Delaware; Daniel J. Kramer, Geoffrey R. Chepiga, Daniel J. Juceam, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP, New York, New York; *Attorneys*

*for Defendants John G. Cox, Anna Protopapas, Brian S. Posner, Louis J. Paglia, Geno J. Germano, John T. Greene, and Andrea DiFabio.*

Stephen E. Jenkins, Richard D. Heins, ASHBY & GEDDES, P.A., Wilmington, Delaware; Tariq Mundiya, Sameer Advani, Richard Li, M. Annie Houghton-Larsen, WILLKIE FARR & GALLAGHER LLP, New York, New York; *Attorneys for Defendants Alexander J. Denner, Sarissa Capital Management LP, Sarissa Capital Domestic Fund LP, Sarissa Capital Offshore Master Fund LP, and Sarissa Capital Management GP LLC.*

**LASTER, V.C.**

In 2017, defendant Alexander J. Denner was a member of the board of directors (the "Board") of Bioverativ, Inc. (the "Company"), a publicly traded biotechnology firm. Denner was also the founder and controlling principal of an activist hedge fund, consisting of an interconnected group of entities affiliated with Sarissa Capital Management, L.P. (collectively, "Sarissa").

In May 2017, Sanofi S.A. approached Denner and another Company director, defendant Brian S. Posner. Sanofi expressed interest in buying the Company for around $90 per share. On the day of Sanofi's approach, the Company's common stock closed at $54.86 per share. Sanofi's proposed price represented a premium of 64.1% over the market price.

The two directors demurred. The complaint supports a reasonable inference that neither of them disclosed Sanofi's approach to the Board.

Instead, Denner caused Sarissa to buy more than a million shares of Company common stock, octupling his holdings. The purchases violated the Company's insider trading policy. Denner did not disclose the purchases to the Board.

Denner stood to make massive profits if Sanofi acquired the Company, but Section 16(b) of the Securities Exchange Act of 1934 loomed as an impediment. That statute requires that an insider disgorge short-swing profits from any sale that takes place less than six months after the purchase. The solution was to delay any engagement with Sanofi so that the sale would take place after the short-swing period closed.

That is exactly what Denner and Posner did. When Sanofi approached Denner and Posner about a transaction in June 2017 and again in September 2017, they told Sanofi that the Company was not for sale. By October 2017, however, the short-swing period was about to expire. This time when Sanofi came calling, Denner proposed a single-bidder process. Denner acted unilaterally to put the Company in play. The Board knew nothing about Sanofi's inquiries.

Several weeks later, in late November 2017, Sanofi offered to acquire the Company for $98.50 per share. This was the first time that the Board learned about Sanofi's interest.

The Company's management team and its financial advisors had valued the Company at more than $150 per share using the projections in the Company's long-range plan. After receiving Sanofi's offer, the Board asked for a higher bid, and Sanofi increased its offer to $101.50. At that point, the Board countered at $105 per share, almost one-third below the Company's standalone valuation under its long-range plan. Sanofi accepted the Board's counter.

The Board approved an agreement and plan of merger with Sanofi (the "Transaction"). In March 2018, the Transaction closed. Sarissa's purchases of Company common stock generated a profit of $49.7 million.

In this lawsuit, the plaintiff asserts that the members of the Board and three of the Company's officers breached their fiduciary duties during the sale process (the "Sale Process Claims"). The plaintiff also asserts that the same defendants breached their fiduciary duty of disclosure when providing stockholders with information about the Transaction. The defendants moved to dismiss those theories as failing to state claims on

2

which relief can be granted. The court previously issued a decision that largely denied that motion. *Goldstein v. Denner* (*Sale Process Decision*), 2022 WL 1671006, at *1 (Del. Ch. May 26, 2022).

The plaintiff also asserts a claim against Denner for breach of fiduciary duty under *Brophy v. Cities Service Co.*, 70 A.2d 5 (Del. Ch. 1949). And the plaintiff asserts a claim against Sarissa for aiding and abetting Denner's breaches of fiduciary duty. In substance, those claims assert that Denner and Sarissa engaged in insider trading (the "Insider Trading Claims").

The defendants moved to dismiss the Insider Trading Claims on two grounds. They argued that the plaintiff had failed to state reasonably conceivable claims, and they asserted that the plaintiff lost standing to pursue the Insider Trading Claims when the Transaction closed. The *Sale Process Decision* deferred consideration of those issues.

This decision finds that the plaintiff has stated a reasonably conceivable claim that Denner breached his duty of loyalty by causing Sarissa to purchase shares of Company common stock after Denner learned material, non-public information about Sanofi's interest in acquiring the Company. In moving to dismiss, the defendants argued that Sanofi's confidential expression of interest in acquiring the Company at more than a 64% premium over the market price did not constitute material, non-public information. They also argued that the court could not infer at the pleading stage that Denner caused Sarissa to buy shares on the basis of Sanofi's expression of interest. At the pleading stage, it is reasonable to infer that the information was material and that Denner acted on it.

This decision finds that the plaintiff has stated a reasonably conceivable claim against Sarissa for aiding and abetting Denner's breach of the duty of loyalty. In moving to dismiss that claim, the defendants did not dispute any element except for the existence of an underlying breach of duty. Because it is reasonably conceivable that Denner breached his duty of loyalty, it is reasonably conceivable that Sarissa aided and abetted the breach by carrying out Denner's insider trading.

A far stronger argument is the defendants' contention that the plaintiff lost standing to pursue the Insider Trading Claims when the Transaction closed. The defendants observe that the Insider Trading Claims rest on the theory that Denner misused the Company's confidential information in a manner that constitutes a breach of the duty of loyalty under *Brophy*. They correctly point out that a *Brophy* claim is a derivative claim. *See Latesco, L.P. v. Wayport, Inc.*, 2009 WL 2246793, at *6 (Del. Ch. July 24, 2009) ("A *Brophy* claim is fundamentally derivative in nature, because it arises out of the misuse of corporate property—that is, confidential information—by a fiduciary of the corporation, for the benefit of the fiduciary and to the detriment of the corporation."). They further point out that in *Lewis v. Anderson*, 477 A.2d 1040 (Del. 1984), the Delaware Supreme Court imposed the continuous ownership requirement, which mandates that a derivative plaintiff hold shares of the corporation continuously throughout the derivative action. As the Delaware Supreme Court held in *Lewis*, a merger in which the plaintiff's shares are converted into other consideration results in the plaintiff no longer holding stock and thus losing standing to assert the derivative claim. *Id.* at 1049. It is undisputed that the Transaction resulted in the plaintiff's stock being converted into a right to receive cash.

Therefore, the defendants say, the plaintiff lacks standing to assert the Insider Trading Claims. As they see it, even if the closing of the Transaction constituted the sale that generated illicit profits for Denner and Sarissa, that event simultaneously deprived all of the sell-side stockholders of their ability to pursue claims against those defendants for their wrongdoing. It follows that the Insider Trading Claims must be dismissed.

The plaintiff responds that he is not pursuing the Insider Trading Claims as derivative claims, but rather as vehicles for challenging the Transaction. In *Parnes v. Bally Entertainment Corporation*, 722 A.2d 1243 (Del. 1999), the Delaware Supreme Court made clear that a plaintiff can bring a direct claim challenging a merger that results, in whole or in part, from conduct that otherwise might be viewed as giving rise to a derivative claim. The plaintiff relies on *Parnes.*

The defendants argue that the *Parnes* exception cannot apply because the magnitude of the potential recovery on the Insider Trading Claims is immaterial in the context of the Transaction. They calculate that the $49.7 million profit from the alleged insider trading constitutes less than 0.5% of the $11.6 billion value of the Transaction—so low as to be insignificant.

In *Parnes*, the Delaware Supreme Court held that a plaintiff has standing to challenge the fairness of a merger if it is reasonably conceivable that the pending derivative claim (or the conduct that otherwise would support a derivative claim) affected *either* the fairness of the merger price *or* the fairness of the process that led to the merger. Here, it is reasonably conceivable that the alleged misconduct affected the fairness of the process. As the court explained in the *Sale Process Decision*, it is reasonably conceivable that the sale

5

process fell outside the range of reasonableness because Denner maneuvered to secure a near-term sale that would lock in the profits from his insider trading. *See Sale Process Decision*, 2022 WL 1671006, at \*35–38.

The defendants respond that if that is the case, then the *Brophy* claim duplicates the Sale Process Claims and should be dismissed on that basis. Court of Chancery Rule 8 permits a plaintiff to plead theories in the alternative. It therefore does not matter at the pleading stage whether the *Brophy* claim might be duplicative of the Sale Process Claims.

It is highly unlikely, however, that the *Brophy* claim will be duplicative of the Sale Process Claims. For purposes of the Sale Process Claims, the principal question is whether the sale process fell outside the range of reasonableness due to a non-exculpated breach of fiduciary duty by Denner. Evidence regarding Denner's insider trading is relevant to whether the sale process fell outside the range of reasonableness because it provides strong evidence of Denner's motive and intent. If the plaintiff prevails, then the likely remedy would be an award of class-wide damages based on the value that the stockholders would have received if the defendants had followed a reasonable process to obtain the best transaction reasonably available, either by achieving a sale at a higher price or by remaining a standalone entity and capitalizing on the Company's business plan. At present, the plaintiff seems to favor the latter theory. It is possible, however, that the record could establish the existence of a breach of fiduciary duty, and yet because the Transaction price included synergies, that price could exceed the standalone value of the Company such that the class would not have suffered damages. *See In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535 (Del. Ch. Oct. 16, 2018), *aff'd*, 211 A.3d 137 (Del. 2019) (TABLE).

6

Through the *Brophy* claim, the plaintiff seeks to prove that Denner breached his fiduciary duties by engaging in insider trading. If the plaintiff proves those claims, then the plaintiff can obtain disgorgement of the $49.7 million in profits that Denner generated. The Delaware Supreme Court has made clear that full disgorgement of profits is an available remedy under *Brophy*, regardless of whether the corporation has been harmed. *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 839 (Del. 2011). If the plaintiff prevails, then the likely remedy would be a class-wide award equal to the amount of the disgorged profits. The *Brophy* claim thus provides a non-duplicative avenue of recovery.

The defendants' motion to dismiss the Insider Trading Claims is therefore denied.

## I.     FACTUAL BACKGROUND

The factual landscape for this decision is the same as for the *Sale Process Decision*. This decision therefore relies on and incorporates by reference the Factual Background set out in the *Sale Process Decision*.

## II.     LEGAL ANALYSIS

Count III and IV of the complaint advance the Insider Trading Claims. As noted, the defendants seek dismissal on two grounds. They contend that the plaintiff lost standing to pursue the Insider Trading Claims when the Transaction closed. They also contend that the Insider Trading Claims fail to state claims on which relief can be granted.

A court typically will address standing first. "Standing is properly a threshold issue that the Court may not avoid." *Morris v. Spectra Energy P'rs (DE) GP, LP*, 246 A.3d 121, 129 (Del. 2021) (cleaned up). In corporate law, standing has assumed special significance because of the distinction between direct and derivative claims. The proper classification

7

of a claim as direct or derivative can be case dispositive when a merger has terminated the plaintiff's status as a stockholder by converting the plaintiff's shares into a different form of property. The Delaware Supreme Court has made clear that if a plaintiff only asserts a derivative claim, then a merger that converts the plaintiff's shares into a different form of property deprives the plaintiff of standing to sue. *Lewis*, 477 A.2d at 1049. But in *Parnes*, the Delaware Supreme Court also made clear that a plaintiff can bring a direct claim challenging a merger that rests, in whole or in part, on conduct that otherwise might be viewed as giving rise to a derivative claim. *See Parnes*, 722 A.2d at 1245. In subsequent cases, the Delaware Supreme Court has explained that a plaintiff can bring a direct claim challenging a merger that rests, in whole or in part, on how the merger treated a derivative claim—or an inchoate cause of action that would otherwise lead to a derivative claim. *See Morris*, 246 A.3d at 136–39 (examining merger's treatment of pending derivative claims); *see also In re Riverstone Nat'l Inc. S'holder Litig.*, 2016 WL 4045411, at *9–13 (Del. Ch. July 28, 2016) (examining "inchoate claim" for usurpation of corporate opportunity).

When considering whether a plaintiff has standing to challenge a merger based on an underlying derivative claim, Delaware jurisprudence looks in the first instance to whether the conduct giving rise to the underlying derivative wrong states a viable claim. *See Morris*, 246 A.3d at 136. Whether the underlying claim is viable raises a gateway question within the threshold issue of standing. *See id.*; *see also Golaine v. Edwards*, 1999 WL 1271882, at *7 (Del. Ch. Dec. 21, 1999) (describing the merits-related focus of the inquiry).

This decision therefore first considers whether the Insider Trading Claims state claims on which relief can be granted. Having determined that it is reasonably conceivable that the Insider Trading Claims state claims on which relief can be granted, this decision then considers whether the plaintiff can use them as a basis to mount a direct challenge to the Transaction.

## A. Rule 12(b)(6)

The defendants have moved to dismiss the Insider Trading Claims under Rule 12(b)(6) for failing to state a claim on which relief can be granted. When considering a motion under Rule 12(b)(6), the court (i) accepts as true all well-pleaded factual allegations in the complaint, (ii) credits vague allegations if they give the opposing party notice of the claim, and (iii) draws all reasonable inferences in favor of the plaintiff. *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 535 (Del. 2011). The court need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party." *Price v. E.I. DuPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011), *overruled on other grounds by Ramsey v. Ga. S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1277 (Del. 2018).

"[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'" *Cent. Mortg.*, 27 A.3d at 537. "Our governing 'conceivability' standard is more akin to 'possibility,' while the federal 'plausibility' standard falls somewhere beyond mere 'possibility' but short of 'probability.'" *Id.* at 537 n.13. Dismissal is inappropriate "unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances." *Id.* at 535.

9

## 1. The Insider Trading Claim Against Denner

The complaint adequately alleges a claim against Denner for breach of fiduciary duty under *Brophy*. The Delaware Supreme Court has framed the elements of a *Brophy* claim as follows: a plaintiff must show that (i) "the corporate fiduciary possessed material, nonpublic company information," and (ii) "the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." *Kahn*, 23 A.3d at 838 (cleaned up). The defendants argue that the complaint does not plead facts to support either element.

### a. Materiality

Delaware law follows the federal standard for materiality. *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (adopting materiality standard from *TSC Industries, Inc. v. Northway, Inc.*, 426 U. S. 438 (1976)). Information is material if it "'would have assumed actual significance in the deliberations' of a person deciding whether to buy, sell, vote, or tender stock." *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004) (quoting *Rosenblatt*, 493 A.2d at 944), *aff'd*, 872 A.2d 960 (Del. 2005) (TABLE). When evaluating materiality for purposes of an individual engaging in insider trading, the court will "evaluate the information in [the fiduciary's] possession, compare it to what the market knew, and identify if any of the non-disclosed information would have been of consequence to a rational investor, in light of the total mix of public information." *Id.* at 940.

The complaint supports a reasonable inference that Sanofi's initial expression of interest was material under that standard. Sanofi expressed interest in acquiring the

10

Company at a price of $90 per share. Sanofi was a credible bidder, and high-level representatives of Sanofi sought to engage with the Company about a deal. Between May 24 and 30, 2017, the Company's stock was trading between $54.16 and $57.21. Sanofi's indication of interest represented a premium of 64.1% over the Company's trading price. It is reasonable to infer that the fact of Sanofi's approach would have assumed actual significance to a rational investor buying or selling shares of the Company's common stock. It is reasonable to infer that the stock would not have continued to trade in its unaffected range if investors knew about Sanofi's outreach, whether that outreach was viewed as a prelude to a deal or as new information about the value that a knowledgeable market participant placed on the Company.

The defendants argue boldly that Sanofi's initial expression of interest was not material because it was a "casual inquir[y]" and not "sufficiently substantive or advanced to constitute material information." Dkt. 26 at 13–16; *see also* Dkt. 35 at 9–10. To advance this argument, they rely on *Bershad v. Curtiss-Wright Corp.*, 535 A.2d 840 (Del. 1987), a decision where the Delaware Supreme Court held that a board of directors did not breach its fiduciary duties by failing to disclose "certain casual inquiries" regarding a potential transaction that the target company flatly rejected and which never led to a sale. *Id.* at 847. The high court stated: "Efforts by public corporations to arrange mergers are immaterial under the *Rosenblatt v. Getty* standard, as a matter of law, until the firms have agreed on the price and structure of the transaction." *Id.*

One year later, the Supreme Court of the United States issued its decision in *Basic v. Levinson*, 485 U.S. 224 (1988), which rejected the price-and-structure rule (also known

11

as the agreement-in-principle test) as contrary to the materiality standard set forth in *TSC Industries*. *Id.* at 232–40. The *TSC Industries* standard is the test for materiality that the Delaware Supreme Court adopted in *Rosenblatt*, 493 A.2d at 944.

In the aftermath of *Basic*, there was uncertainty whether the price-and-structure rule continued to govern under Delaware law. No longer. In *Alessi v. Beracha*, 849 A.2d 939 (Del. Ch. 2004), Chancellor Chandler explained why the outcome in *Bershad* made sense on its facts:

> In *Bershad*, the evidence indicated that the defendants informed inquiring parties that "Dorr-Oliver was not for sale." In addition, the one inquiring party that the plaintiff specifically identified "did not have detailed, non-public financial data on Dorr-Oliver and never seriously considered making an offer." The Court held that "since it is undisputed that: (1) Dorr-Oliver was not for sale, and (2) no offer was ever made for Dorr-Oliver, the defendants were not obligated to disclose preliminary discussions regarding an unlikely sale."

*Id.* at 945 (cleaned up).

Chancellor Chandler then explained at length why the fact-specific ruling in *Bershad* could not be read as establishing a "broad and inflexible rule" in which no duty to disclose arose until there was an agreement on price and structure. *Id.* at 946–50. He observed that the Delaware Supreme Court provided three rationales for ruling in the defendant's favor in *Bershad*:

- "The probability of completing a merger benefiting all shareholders may well hinge on secrecy during the negotiation process." *Bershad*, 535 A.3d at 847 n.5.

- "[I]t would be very difficult for those responsible individuals to determine when disclosure should be made." *Id.*

12

- "Delaware law does not require disclosure of inherently unreliable or speculative information which would tend to confuse stockholders or inundate them with an overload of information." *Alessi*, 849 A.2d at 947 (cleaned up).[1]

Chancellor Chandler explained that each of these considerations supported a fact-specific inquiry into whether the information in question was material and needed to be disclosed. Each consideration could weigh against disclosure in some circumstances, but not others.

- "The first rationale, that secrecy increases shareholder wealth in some cases, is not a justification for maintaining secrecy in all cases." *Id*.

- "The second rationale, that fiduciaries find non-disclosure of merger negotiations easier than tough decisions about when to disclose, is insufficient to justify the omission of material information . . . ." *Id.* at 947–48. Materiality always requires a fact-based judgment in light of all of the circumstances. Any approach that makes "a single fact or occurrence" outcome-determinative will "necessarily be over- or underinclusive." *Id.* at 948 (cleaned up).

- "The third rationale, shareholder confusion, is the least persuasive . . . ." *Id.* The rationale improperly assumed "that investors are nitwits, unable to appreciate— even when told—that mergers are risky propositions up until the closing." *Id.* (cleaned up).

Chancellor Chandler concluded that although each of the rationales expressed a valid concern, they did not justify a bright-line rule. *Id.* at 947–48.

Chancellor Chandler also noted that the *Basic* decision had rejected the price-and-structure test. The Supreme Court of the United States stated:

> We . . . find no valid justification for artificially excluding from the definition of materiality information concerning merger discussions, which would otherwise be considered significant to the trading decision of a reasonable

---

[1] Chancellor Chandler drew this rationale from *Arnold v. Society for Savings Bancorp*, 650 A.2d 1270, 1280 (Del. 1994). He observed that "[a]lthough not found in *Bershad*, the Delaware Supreme Court stated in *Arnold* that this 'principle is consistent with *Bershad*.'" *Alessi*, 849 A.2d at 947 n.48 (quoting *Arnold*, 650 A.2d at 1280).

13

> investor, merely because agreement-in-principle as to price and structure has not yet been reached by the parties or their representatives.

*Basic*, 485 U.S. at 236. The *Basic* decision held that "[w]hether merger discussions in any particular case are material . . . depends on the facts." *Id.* at 239. Elaborating, the Court explained that whether a contingent event, such as a merger, is material "will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity." *Id.* at 238 (cleaned up). Chancellor Chandler held that Delaware law followed the *Basic* test. *Alessi*, 849 A.2d at 949–50.

Under the *Alessi* standard, Sanofi's initial expression of interest was material, non-public information. The offer was serious and addressed what was "arguably the most important event in [the Company's] short life." *Id.* at 949. Sanofi had discussions with two key directors (Posner and Denner), and the approach subsequently led to a formal offer in the same price range and to the eventual consummation of the Transaction.[2]

---

[2] The defendants cite other authorities to support the proposition that preliminary merger discussions are not material, but those cases are distinguishable and involved preliminary discussions about deals that never came to fruition. *Compare* Dkt. 26 at 14–15 (citing *In re Wayport, Inc. Litig.*, 76 A.3d 296 (Del. Ch. 2013); *In re MONY Gp. Inc. S'holder Litig.*, 852 A.2d 9 (Del. Ch. 2004); *Shamrock Hldgs., Inc. v. Polaroid Corp.*, 559 A.2d 257 (Del. Ch. 1989)), *with Wayport*, 76 A.3d at 321 (post-trial decision involving a fiduciary's disclosure obligations when buying stock from another stockholder and finding the existence of an entity's proposal was not material because the entity never accepted the company's counteroffer, no agreement on price and structure was reached, and the transaction did not come to fruition), *MONY*, 852 A.2d at 29–30 (preliminary injunction decision holding that there was no obligation to disclose an expression of interest made by an entity other than the ultimate acquirer that "did not provide a price or structure" and was contingent on the pending deal's failure), *and Shamrock*, 559 A.2d at 261–62, 274–75 (post-trial decision involving the adoption of an employee stock ownership plan, not a

It is also important to note that *Bershad*, *Basic*, and *Alessi* dealt with whether information was sufficiently material that it needed to be disclosed to all stockholders. Chancellor Chandler's analysis in *Alessi* acknowledges that certain types of information may be material—in the sense of assuming actual significance to a person deciding whether to buy, sell, vote, or tender shares of stock—and yet there could be other fact-specific considerations that would counsel against a duty to disclose.

A *Brophy* claim does not require a determination that the fiduciary who engaged in insider trading possessed information that was sufficiently material that the corporation's fiduciaries were obligated to disclose that information promptly to all of corporation's investors. This decision is not holding, for example, that the Board had an obligation to disclose Sanofi's approach promptly after it was made. Denner and Posner had an obligation to disclose Sanofi's approach promptly to their fellow directors, and the Board had an obligation to describe Sanofi's initial approach accurately when making a recommendation to the Company's stockholders in connection with the Transaction. But that does not mean that the Board had an obligation in May 2017 to issue a Form 8-K broadcasting Sanofi's expression of interest to the market.

Nor does a *Brophy* claim depend on the existence of such a disclosure obligation. A *Brophy* claim rests on the premise that a fiduciary should not have taken advantage of the

---

merger, and holding that there was no obligation to disclose that an entity had "expressed its interest in a 'friendly' meeting" with management because "[i]ts only significance [was] as a possible forerunner to an acquisition proposal" that ultimately did not materialize).

information to obtain a self-interested benefit. The *Brophy* decision did not speak in terms of *material* information in the sense of facts the corporation was obligated to disclose; it spoke in terms of *confidential* information which, if disclosed, would have an impact on the trading price. 70 A.2d at 7. The facts in *Brophy* involved an officer buying shares in advance of the corporation's making open market purchases in quantities sufficient to increase the market price, at which point the officer sold at a profit. *Id.* The court applied the blackletter principle that

> [a] fiduciary is subject to a duty to the beneficiary not to use on his own account information confidentially given him by the beneficiary or acquired by him during the course of or on account of the fiduciary relation or in violation of his duties as fiduciary, in competition with or to the injury of the beneficiary, although such information does not relate to the transaction in which he is then employed, unless the information is a matter of general knowledge.

*Id.* at 7–8 (quoting Restatement (First) of Restitution § 200, cmt. a (Am. L. Inst. 1937)). The *Brophy* decision did not turn on whether the directors of the corporation had an obligation to disclose the specific timing and volume of the corporation's upcoming purchases. It was enough that the insider intentionally misused the confidential information for his own benefit. *See id.*; *accord Rosenberg v. Oolie*, 1989 WL 122084, at *3 (Del. Ch. Oct. 16, 1989); *Field v. Allyn*, 457 A.2d 1089, 1099 (Del. Ch.), *aff'd*, 467 A.2d 1274 (Del. 1983).

Generally speaking, the inquiry for evaluating whether a fiduciary possessed material, non-public information under *Brophy* will be identical to the inquiry for evaluating whether the fiduciary had a duty to disclose the information. *See Oracle*, 867 A.2d at 940. But the two inquiries can diverge. For purposes of a *Brophy* claim, assessing

16

whether the information is material under *TSC Industries* serves two purposes. First, it provides a method of evaluating whether the information would have had an impact on the price of the stock such that the fiduciary obtained an improper benefit by engaging in insider trading. Second, it establishes an appropriately high bar for establishing the point when a fiduciary must abstain from trading or face an obligation to disgorge profits. *In re Clovis Oncology, Inc. Deriv. Litig.*, 2019 WL 4850188, at *15 (Del. Ch. Oct. 1, 2019) ("[O]ur law sets the bar for stating a claim for breach of fiduciary duty based on insider trading very high.").[3] But as the considerations expressed in *Bershad*, *Basic*, and *Alessi*

---

[3] *Clovis* and two other recent decisions from this court have coupled comments about the high bar for pleading a *Brophy* claim with Justice Hartnett's observation, made while serving as a Vice Chancellor, that "absent special circumstances, corporate officers and directors may purchase and sell the corporation's stock at will, without any liability to the corporation." *Tuckman v. Aerosonic Corp.*, 1982 WL 17810, at *11 (Del. Ch. May 20, 1982); *see Clovis*, 2019 WL 4850188, at *15 (quoting *Tuckman*, 1982 WL 17810, at *11); *accord In re Camping World Hldgs, Inc. S'holder Deriv. Litig.*, 2022 WL 288152, at *9 n.94 (Del. Ch. Jan. 31, 2022); *Tilden v. Cunningham*, 2018 WL 5307706, at *19 (Del. Ch. Oct. 26, 2018). Before these recent cases, the *Tuckman* decision had not been cited since 2005, when it enjoyed a brief renaissance that witnessed four case citations over a period of four years, albeit not for the quoted proposition. Before 2001, no case had cited *Tuckman* for any proposition. The *Tuckman* opinion is a well-reasoned, post-trial decision that deserves consideration as a precedent, but its language should not be taken out of context. After the quoted text, the passage in *Tuckman* continues, with Justice Hartnett identifying the two factors that are necessary for special circumstances to exist: "inside information and the use thereof for personal gain." *Tuckman*, 1982 WL 17810, at *11. The *Tuckman* case was thus paraphrasing *Brophy*, nothing more. To reiterate, it was a post-trial decision that conducted a careful analysis of the facts that the insider possessed before entering judgment in the insider's favor. *Id.* It is not clear to me that *Tuckman* warrants being pressed into service to support the existence of a high bar for pleading a *Brophy* claim. The policy-driven rationales for establishing a high bar for pleading a *Brophy* claim are rather traceable to *Oracle*, 867 A.2d at 930–34, and *Guttman v. Huang*, 823 A.2d 492, 502–05 (Del. Ch. 2003), which discussed the benefits of equity-based compensation for aligning the interests of officers and directors with those of stockholders as a whole.

demonstrate, there are situations in which a corporate board does not have an obligation to

make a prompt disclosure of material, non-public information precisely because a period

of confidentiality benefits the corporation and its stockholders, and yet in that same

---

There is a distinction between promoting equity *ownership*, which generally aligns the interests of corporate fiduciaries with those of their beneficiaries, and facilitating equity *trading*, which can create conflicts of interest through the lure of risk-free profits. One might argue that the law should encourage long-term equity ownership because it aligns the interests of managers with the interests of the corporation as a presumptively permanent entity and with the interests of stockholders as providers of presumptively permanent capital, *see Frederick Hsu Living Tr. v. ODN Hldg. Corp.*, 2017 WL 1437308, at *18 (Del. Ch. Apr. 14, 2017), while at the same time creating disincentives in the form of consequences for managers who trade in ways that take advantage of their superior knowledge to the detriment of the corporation and its long-term stockholders. It may be that a high bar for *Brophy* claims is warranted, but it is not clear to me that the policy rationales that favor managerial equity ownership point in that direction. This issue is but one aspect of the larger debate over the merits of insider trading and the methods for policing it, where a range of views exist amidst a vast literature that now spans six decades. *See* Kimberly D. Krawiec, *Fairness, Efficiency, and Insider Trading: Deconstructing the Coin of the Realm in the Information Age*, 95 Nw. U. L. Rev. 443, 444 (2001) (describing the regulation of insider trading as "one of the most hotly debated topics in the securities law literature"); *compare, e.g.,* James J. Park, *Insider Trading and the Integrity of Mandatory Disclosure*, 2018 Wis. L. Rev. 1133, 1139 (2018) (discussing rationales for regulating insider trading and recommending an orientation towards protecting the integrity of the federal mandatory disclosure regime), and George W. Dent, Jr., *Why Legalized Insider Trading Would Be A Disaster*, 38 Del. J. Corp. L. 247, 248 (2013) (advancing policy arguments and concluding that "the case for insider trading is unsupportable"), *with* Henry Manne, *Insider Trading and the Stock Market* (1966) (arguing that insider trading promotes market efficiency and could be used as a compensation scheme); *see generally* Alexander Padilla, *How Do We Think About Insider Trading? An Economist's Perspective On The Insider Trading Debate And Its Impact*, 4 J.L. Econ. & Pol'y 239 (2008) (surveying academic literature to evaluate the influence of Manne's arguments).

scenario, corporate insiders are obligated not to make use of the information for the purpose of insider trading.[4]

In this case, the complaint easily supports an inference that disclosure of Sanofi's initial expression of interest would have had an effect on the price of the stock. Accepting for purposes of this analysis that the Board did not have a duty to issue a prompt public statement about Sanofi's approach, it remains reasonably conceivable that Sanofi's initial expression of interest represented material, non-public information in the sense required for a *Brophy* claim.

---

[4] I therefore respectfully disagree with *Oracle* to the extent that decision held that the analytical exercise that a court engages in when determining whether a fiduciary possesses material, non-public information for purposes of a *Brophy* claim is always identical to that required to determine whether a director should be liable for failing to disclose a material fact. *See Oracle*, 867 A.2d at 940 ("In determining whether corporate insiders are liable under *Brophy* because they allegedly possessed material, inside information, the court is engaged in an analytical exercise identical to that required to determine whether an issuer that sold or bought stock should be liable because it failed to disclose material information or to determine whether a director should be liable for failing to disclose a material fact in a corporate disclosure seeking a vote or tender."). There can be situations in which loyal corporate fiduciaries would both not promptly disclose information *and* abstain from trading on the basis of that information. It bears noting that the non-public information in *Oracle* involved projections about the corporation's quarterly performance and the extent to which the insiders knew that the company's actual performance had deviated from the company's guidance. *See id.* at 940–43. That is a different type of information than what is at issue in this case, and it makes sense in that setting that there would be little if any room for daylight between the test for determining when fiduciaries were obligated to update their projections and the test for determining when fiduciaries would have a duty to abstain from trading. *See id.* at 939–40.

### b. Scienter

To satisfy the second element of the *Brophy* claim, the plaintiff must plead allegations that support an inference that Denner used material, non-public information to make trades "motivated, in whole or in part, by" that information. *Kahn*, 23 A.3d at 838. In other words, the plaintiff must plead scienter. The defendants bravely assert that the plaintiff "offers nothing more than speculation and unsupportable inferences." Dkt. 26 at 16.

It is reasonably conceivable that Denner's stock purchases in May 2017 were motivated by Sanofi's initial expression of interest. Before Denner's meeting with Sanofi, Denner and Sarissa did not have large holdings of Company common stock. Denner owned 3,945 shares. Sarissa owned 155,000 shares. Just days after the meeting, Denner caused Sarissa to begin purchasing Company common stock.

- On May 24, 2017, Sarissa purchased 340,000 shares of Company stock.

- On May 25, 2017, Sarissa purchased 130,000 shares of Company stock.

- On May 26, 2017, Sarissa purchased 450,000 shares of Company stock.

- On May 30, 2017, Sarissa purchased 90,000 shares of Company stock.

In total, during the week after his meeting with Sanofi, Denner caused Sarissa to pay $56.3 million to purchase 1,010,000 shares of Company stock at prices between $54.16 and $57.21 per share. At a transaction price of $90 per share, Sarissa would make a profit of nearly $35 million.

It is reasonable to infer that Denner bought the shares with the expectation that Sarissa would profit from a near-term sale of the Company. Denner and Sarissa have

generated significant profits on large equity positions when other companies were sold. For example, Denner had served as a director of Ariad Pharmaceuticals, Inc. He subsequently shepherded Ariad into a sale to Takeda Pharmaceutical Company, Limited. Sarissa made a profit of $260 million on its stake. It is reasonable to infer that Denner sought to run the same play and generate profits from a sale of the Company.

None of the defendants' arguments move the needle, and their main authority supports an inference of scienter. *See* Dkt. 26 at 16–18. The defendants rely most heavily on *Clovis*, where Vice Chancellor Slights explained that "[a]t the pleading stage, by necessity, a *Brophy* claim usually rests on circumstantial facts and a successful claim typically includes allegations of unusually large, suspiciously timed trades that allow a reasonable inference of scienter." *Clovis*, 2019 WL 4850188, at *15. He expressed doubt in that case that temporal proximity alone would be enough to support an inference of scienter, but he observed that timing paired with some other factor, such as the size of the trade, can get a plaintiff over the line. *Id.* Within eleven days after Sanofi's initial expression of interest, Sarissa increased its stock ownership from 155,000 shares to 1,010,000 shares—a nearly 85% increase.

Based on these facts, scienter is adequately pled. The complaint states a claim against Denner for breach of the duty of loyalty under *Brophy*.[5]

---

[5] To state the obvious, this is a pleading-stage decision. Discovery may show that Denner was not motivated, in whole or in part, by Sanofi's approach, but rather would have increased Sarissa's equity position after the Spinoff in any event. When presented with more developed factual records, this court has either rejected or questioned whether fiduciaries in fact traded based on inside information. *See, e.g.*, *Rosenberg*, 1989 WL

## 2. The Insider Trading Claim Against Sarissa

The plaintiff asserts a claim against Sarissa for aiding and abetting Denner's breach of fiduciary duty under *Brophy*. An aiding abetting claim has four elements: (i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by a non-fiduciary defendant, and (iv) damages proximately caused by the breach. *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001). Sarissa only contests the second element. *See* Dkt. 26 at 21. For the reasons discussed in the prior section, the complaint supports a reasonable inference that Denner was a fiduciary who breached his duties. Because the other elements are uncontested, the complaint also states a claim against Sarissa for aiding and abetting.

## B. Standing

The defendants devote the bulk of their effort to arguing that the Insider Trading Claims must be dismissed for lack of standing. Both sides approached the question of the plaintiff's standing using the framework articulated in *In re Primedia, Inc. Shareholders Litigation*, 67 A.3d 455 (Del. Ch. 2013), which the Delaware Supreme Court endorsed in

---

122084, at *4 (denying preliminary injunction; observing that "it seems unlikely that the Court would find, after trial, that the undisclosed plan to sell NNET was linked in any way to the defendant directors' decision to lend needed funds to the company"); *Stepak v. Ross*, 1985 WL 21137, at *5 (Del. Ch. Sept. 5, 1985) (approving settlement of *Brophy* claims in part because of difficulty in proving that "each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information"); *Tuckman*, 1982 WL 17810, at *11 (holding after trial that defendant sold stock to secure an additional source of capital that could be used to alleviate corporation's cash flow problems and not to make a secret profit).

*Morris*. *See Morris*, 246 A.3d at 136. The *Primedia* test, however, is an application of *Parnes*, the seminal precedent in this area. This case involves a factual variation that *Primedia* anticipated, but which the decision did not need to address.

Under *Parnes*, "[a] stockholder who directly attacks the fairness or validity of a merger alleges an injury to the stockholders, not the corporation, and may pursue such a claim even after the merger at issue has been consummated." 722 A.2d at 1245. The *Primedia* test implements *Parnes* by examining whether there is reason to think that the merger consideration failed to incorporate value for a derivative claim such that the stockholder plaintiff has standing to challenge the merger on that basis. *Houseman v. Sagerman*, 2014 WL 1600724, at *11 (Del. Ch. Apr. 16, 2014). To analyze that issue, the *Primedia* test asks three questions:

- First, has the plaintiff pled an underlying derivative claim that has survived a motion to dismiss or otherwise could state a claim on which relief could be granted?

- Second, is the value of the derivative claim material in the context of the merger?

- Third, does the complaint support a pleading-stage inference that the acquirer would not assert the underlying derivative claim and did not provide value for it?

*See Morris*, 246 A.3d at 136; *Primedia*, 67 A.3d at 477.

The *Primedia* test applies most readily when a plaintiff challenges a merger based on a board's alleged failure to obtain value for an underlying derivative claim that existed prior to and independent of the merger. In *Morris*, the Delaware Supreme Court endorsed the *Primedia* framework for this purpose, stating: "When the court is faced with a post-merger claim challenging the fairness of a merger based on the defendant's failure to secure value for derivative claims, we think that the *Primedia* framework provides a reasonable

23

basis to conduct a pleadings-based analysis to evaluate standing on a motion to dismiss." *Morris*, 246 A.3d at 136. The Delaware Supreme Court did not hold that the *Primedia* framework provided the exclusive framework for evaluating any effort to maintain standing to assert a derivative claim following a merger.

In *Primedia*, the plaintiffs challenged a merger on the grounds that it provided no value for a long-pending *Brophy* claim. *See Primedia*, 67 A.3d at 485. The underlying *Brophy* claim asserted that the controlling stockholder had used inside information to purchase shares of preferred stock in 2002. The plaintiff filed suit in 2005. After a lengthy special committee process and an appeal to the Delaware Supreme Court, the claim remained pending in 2011, when the challenged merger closed. The merger provided Primedia's stockholders with total consideration of $316 million. *Id.* at 482. The *Brophy* claims sought disgorgement of profits in the amount of $190 million, plus pre- and post-judgment interest. It was undisputed that the merger consideration provided no value for the *Brophy* claim, and the complaint's allegations supported an inference that the acquirer would never pursue it. *See id.* at 479, 484–85. On those facts, the court held that the plaintiff had standing to challenge the merger. *Id.* at 485.

Embracing the *Primedia* test, the defendants contend that the plaintiff cannot pursue the Insider Trading Claims because the plaintiff cannot satisfy the second factor. They calculate that Denner's $49.7 million profit from the alleged insider trading constitutes less than 0.5% of the $11.6 billion value of the Transaction. The defendants claim that a percentage so low cannot be material.

The plaintiff answers that the defendants have ignored a second basis for a direct challenge to a merger that *Parnes* recognized and which the *Primedia* decision acknowledged but did not need to reach. In *Parnes*, the Delaware Supreme Court did not hold that a stockholder only could assert a direct claim challenging a merger if the value of the diverted proceeds were so large as to render the price unfair. The Delaware Supreme Court instead recognized more broadly that a stockholder could assert a direct claim challenging a merger if the facts giving rise to what otherwise would constitute a derivative claim led *either* to the price *or* the process being unfair.[6] In *Primedia*, the court identified this dimension of *Parnes* and explained that "[t]here is a strong argument that under *Parnes*, standing would exist if the complaint challenging the merger contained adequate allegations to support a pleading[]-stage inference that the merger resulted from an unfair process due at least in part to improper treatment of the derivative claim." 67 A.3d at 482 n.5. The *Primedia* decision did not explore that aspect of *Parnes* because the value of the *Brophy* claim in that case was so clearly material. *Id.*

The second dimension of *Parnes* is important, because a rule that limited standing to claims where the recovery was material in the context of the merger could facilitate

---

[6] *See Parnes*, 722 A.2d at 1245 (explaining that *Kramer v. Western Pacific Industries*, 546 A.2d 348 (1988), did not support a direct claim because "[t]he complaint did not question the fairness of the price offered in the merger *or* the manner in which the merger agreement was negotiated," and the complaint "did not allege that the merger price was unfair *or* that the merger was obtained through unfair dealing" (emphasis added)); *id.* (holding that in order to state a direct claim with respect to a merger, a stockholder must allege facts "charging . . . directors with breaches of fiduciary duty resulting in unfair dealing and/or unfair price").

plenty of self-dealing. As a rule of thumb, 5% is often used as a starting point or rough gage of materiality.[7] Applying that principle in an $11.6 billion deal, fiduciaries could pocket side benefits or engage in insider trading to the tune of $348 million before anyone would have standing to challenge their actions.[8]

---

[7] *See, e.g.*, SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, 45151 (Aug. 19, 1999) (acknowledging that many companies and auditors use a five percent threshold as a rule of thumb in assessing materiality and explaining that "[t]he staff has no objection to such a 'rule of thumb' as an initial step in assessing materiality"); Edward A. Weinstein, *Materiality: Whose Business Is It?*, CPA J. (Aug. 2007), http://archives.cpajournal.com/2007/807/infocus/p24.htm ("Although the professional literature never explicitly defined a 'normal' materiality limit, many auditors considered it to be 5% of net income."); Matthew J. Barrett, *The SEC and Accounting, In Part Through the Eyes of Pacioli*, 80 Notre Dame L. Rev. 837, 874 (2005) ("As a general rule, accountants and auditors usually treat any amount which does not exceed five percent of income before taxes as immaterial."); Manning Gilbert Warren III, *Revenue Recognition and Corporate Counsel*, 56 SMU L. Rev. 885, 901 (2003) ("Many accounting professionals have continued to apply a . . . presumption that information that accounts for less than five percent is not material.").

[8] Using a materiality standard based on the harm to the Company from the derivative claim is also a poor fit with a *Brophy* claim, because a *Brophy* claim does not require that the corporation suffer harm. In the namesake decision, the Court of Chancery stated that,

> In equity, when the breach of a confidential relation by an employee is relied on and an accounting for any resulting profits is sought, loss to the corporation need not be charged in the complaint. Public policy will not permit an employee occupying a position of trust and confidence toward his employer to abuse that relation to his own profit, regardless of whether his employer suffers a loss.

*Brophy*, 70 A.2d at 8 (citations omitted). The Delaware Supreme Court has addressed this issue squarely, adopted the reasoning in *Brophy*, and held that it is inequitable to allow a fiduciary to profit by using confidential corporate information. *Kahn*, 23 A.3d at 837–38. Even where there is no harm to the company, equity demands disgorgement of illicit profit. *Id*; *accord Primedia,* 67 A.3d at 475 ("full disgorgement of profits is an available remedy under *Brophy*, regardless of whether the corporation was harmed").

This case implicates the second path that *Parnes* recognized. The weight of Delaware authority has interpreted *Parnes* as recognizing that a stockholder can assert a direct claim challenging a merger based on process challenges alone.[9] Put differently, standing exists to assert a direct claim when a plaintiff alleges breaches of fiduciary duty that resulted in either an unfair price *or* an unfair process.

In this case, the plaintiff advances the Insider Trading Claims as a basis for challenging the fairness of the sale process. For the reasons explained in the *Sale Process Decision*, it is reasonably conceivable that the conduct giving rise to the Insider Trading Claims tainted the sale process. For example, instead of informing the Board that Sanofi was interested in a potential transaction in May 2017, Denner chose to use Sarissa to buy more than a million shares of Company common stock. *Sale Process Decision*, 2022 WL 1671006, at *7–8, *34–35. At Sanofi's proposed transaction price, he could make a nearly

---

[9] *See Feldman v. Cutaia*, 951 A.2d 727, 734–35 (Del. 2008) ("In *Kramer*, our analysis recognized that claims of mismanagement resulting in a decrease in the value of corporate stock are derivative in nature, while attacks involving fair dealing *or* fair price in a corporate transaction are direct in nature." (cleaned up) (emphasis added)); *Blue v. Fireman*, 2022 WL 593899, at *9 (Del. Ch. Feb. 28, 2022) ("The side transaction's effect on the merger's price *or* process must be material, so as to have affected the merger's fairness." (footnote omitted) (emphasis added)); *In re Ply Gem Indus., Inc. S'holders Litig.*, 2001 WL 755133, at *5 (Del.Ch. June 26, 2001) ("*Parnes* makes clear that the test is whether the alleged breaches of fiduciary duties resulted in unfair price and/or unfair process. Thus, given the disjunctive nature of the standard, it is difficult to imprint an unfair price concept on the process side of the *Parnes* evaluation." (cleaned up)); *see also Chaffin v. GNI Gp., Inc.*, 1999 WL 721569, at *7–8 (Del. Ch. Sept. 3, 1999) (finding that plaintiffs challenged the process and price and thus set forth a direct claim, not a derivative claim). *But see Golaine*, 1999 WL 1271882, at *6–7 (questioning whether *Parnes* leaves open the ability of a plaintiff to challenge a merger based on process violations alone).

27

$35 million profit. *Id.* at *34. To avoid having to disgorge those profits, Denner kept Sanofi at bay until the end of the six-month disgorgement period. *Id.* at *35. Once the end of that period was on the horizon, Denner suggested to Sanofi that they engage in a quick single-bidder process. *Id.* at *10. With the help of his allies on the Board and the systematic slashing of the Company's projections, Denner was able to steer the Company into a sale substantially below the standalone value implied by the Company's long-term plan. *See id.* at *35–39.

It is reasonably conceivable that Denner followed this approach to serve his own interests in maximizing his short-term profits from insider trading at the expense of generating greater value through a competitive bidding process or by having the Company remain independent. The claims are therefore direct, and the plaintiff need not show in addition that the value of the derivative claim is material in the context of the Transaction.

## C. The Duplicative Claim Argument

In a last gasp argument, the defendants argue that if Count III states a direct claim, then "that claim is virtually indistinguishable from [the plaintiff's] alleged breach of loyalty *Revlon* claim against Denner in Count I" and should be dismissed as duplicative. Dkt. 35 at 6 (cleaned up). Under the pleading system that the Federal Rules of Civil Procedure introduced and which Delaware adopted in 1948, asserting that one claim is "virtually indistinguishable" from another is not a basis for dismissal.

The idea that a plaintiff must plead distinct, non-duplicative legal theories is a throwback to common law pleading. *See generally Garfield v. Allen*, — A.3d —, 2022 WL 1641802, at *49–54 (Del. Ch. May 24, 2022). The Federal Rules of Civil Procedure

28

abrogated the common law approach. *See* 5 Charles Alan Wright & Arthur R. Miller,

*Federal Practice and Procedure* § 1219 (4th ed.), Westlaw (database updated Apr. 2022).

The Delaware courts embraced the new regime by adopting rules modeled on the

Federal Rules of Civil Procedure. *See* Daniel L. Herrmann, *The New Rules of Procedure*

*in Delaware*, 18 F.R.D. 327, 328–29 (1956). The centerpiece of the current system is Court

of Chancery Rule 8, which provides that "[a] pleading which sets forth a claim for relief, .

. . shall contain (1) a short and plain statement of the claim showing that the pleader is

entitled to relief and (2) a demand for judgment for the relief to which the party deems

itself entitled." Ct. Ch. R. 8(a). Unlike at common law, a party can plead alternative and

even inconsistent theories. Addressing this issue explicitly, the Rules state:

> A party may set forth 2 or more statements of a claim or defense alternately
> or hypothetically, either in 1 count or defense or in separate counts or
> defenses. . . . A party may also state as many separate claims or defenses as
> the party has regardless of consistency.

*Id.* R. 8(e)(2).

It is thus not grounds for a pleading-stage dismissal for a defendant to argue that

one legal theory is or could be duplicative of another. That does not mean that a court

cannot prune an excessively verdurous pleading. Court of Chancery Rule 16(a)

contemplates that a court may take steps to "formulat[e] and simplif[y] . . . the issues" and

to address "[s]uch other matters as may aid in the disposition of the action." *Id.* R. 16(a)(1),

(5). Commentary on Federal Rule of Civil Procedure 16 explains that "case management

[is] an express goal of pretrial procedure." 6A Charles Alan Wright & Arthur R. Miller,

*Federal Practice and Procedure* § 1521 (3d ed. 2010), Westlaw (database updated Apr. 2022). The Advisory Committee's note to the federal rule states:

> Empirical studies reveal that when a trial judge intervenes personally at an early stage to assume judicial control over a case and to schedule dates for completion by the parties of the principal pretrial steps, the case is disposed of by settlement or trial more efficiently and with less cost and delay than when the parties are left to their own devices.

Fed. R. Civ. P. 16 advisory committee's note to 1983 amendment. To that end, although Rule 16 still refers to a "pretrial conference," the emphasis has shifted "away from a conference focused solely on the trial and toward a process of judicial management that embraces the entire pretrial phase." *Id.* The commentary recognizes that "[t]he timing of any attempt at issue formulation is a matter of judicial discretion." *Id.*

A court thus has discretion to address a duplicative claim in an effort to narrow the issues. *See Swipe Acq. Corp. v. Krauss*, 2020 WL 5015863, at *8 (Del. Ch. Aug. 25, 2020) (collecting cases). At the pleading stage, however, a duplicative claim generally will go forward. *See Espinoza v. Zuckerberg,* 124 A.3d 47, 67 n.102 (Del. Ch. 2015) (collecting cases).

In this case, there is no benefit to be achieved from attempting to prune the pleading. The scope of discovery will not change. The issues at trial will not change.

Instead, retaining Count III serves the helpful purpose of making clear that the plaintiff is asserting a claim of wrongdoing against Denner that will support the additional remedy of disgorgement. In Count IV, the plaintiff seeks that form of relief from Sarissa on the premise that Sarissa aided and abetted Denner's misconduct. Denner controlled Sarissa, caused Sarissa to engage in insider trading, and benefitted from Sarissa's actions.

Although it is not necessary to make a formal determination at this stage, it seems likely that if the plaintiff proves his claims, then the remedy of disgorgement could be imposed on either Denner or Sarissa or both.

Because the defendants focus on the claim against Denner in Count III, this decision does as well. The potential for a disgorgement remedy based on the illicit profits from insider trading distinguishes Counts III from the more traditional claim for breach of fiduciary duty that the plaintiff asserts in Count I. Under the latter theory, the principal issues for the claim against Denner are whether the sale process fell outside the range of reasonableness and whether Denner committed a non-exculpated breach of duty. Evidence regarding Denner's insider trading is relevant because it provides strong evidence of Denner's motive and intent. If the plaintiff prevails, then the likely remedy would be an award of class-wide damages based on the value that the stockholders would have received if the defendants had followed a reasonable process and obtained the best transaction reasonably available, either by achieving a sale at a higher price or by remaining a standalone entity and capitalizing on the Company's business plan.

In Count III, the plaintiff seeks to prove that Denner breached his fiduciary duties by engaging in insider trading. If the plaintiff proves those claims, then the plaintiff can obtain disgorgement of the $49.7 million in profits that Denner generated. As previously explained, full disgorgement of profits is an available remedy under *Brophy*, regardless of whether the corporation was harmed. *Kahn*, 23 A.3d at 837–38; *Primedia*, 67 A.3d at 475. Count III thus provides an independent and additional source of recovery from Denner.

It is theoretically possible that a plaintiff could prevail on the type of claim that the plaintiff has asserted in Count I and yet not recover any damages. In *PLX Technology*, former stockholders of PLX Technology brought a class action asserting that the director defendants breached their fiduciary duties by selling the company to a third-party bidder. *PLX Tech.*, 2018 WL 5018535, at *1. The plaintiffs maintained that the defendants should have continued to operate PLX Technology as a standalone entity, but that a director affiliated with a hedge fund successfully pushed the directors into a near-term sale that served his hedge fund's interests in locking in short-term profits. As a remedy, the plaintiffs sought money damages equal to the "fair" or "intrinsic" value of their stock at the time of the merger, less the price per share that they actually received. *Id.* at *50–51. The court found that the director affiliated with the hedge fund had engaged in disloyal conduct that tainted the sale process, but the court nevertheless concluded that other aspects of the sale process were sufficiently reliable that the deal price exceeded the standalone value of the company. *Id.* at *55–56. The plaintiffs therefore could not recover. *Id.* On appeal, in a two-page order, the Delaware Supreme Court summarily affirmed. The order made clear that the Delaware Supreme Court endorsed the trial court's finding "that the plaintiff-appellants did not prove that they suffered damages." *PLX Tech.*, 211 A.3d at 137. *See generally* Charles Korsmo & Minor Myers, *What Do Stockholders Own? The Rise of the Trading Price Paradigm in Corporate Law*, 47 J. Corp. L. 389, 425–28 (2022).

Were this case to unfold like *PLX Technology*, Count III would provide the putative class with an alternative basis to recover damages from Denner. Even in a situation where the record ultimately proves that the Transaction price provided fair value, the plaintiff can

obtain a class-wide remedy in the form of disgorgement of the $49.7 million profit that Denner secured.

This court has "broad discretion to tailor a remedy to suit the situation as it exists." *Gilliland v. Motorola, Inc.*, 873 A.2d 305, 312 (Del. Ch. 2005). The "protean power of equity" allows a court to "fashion appropriate relief," and a court "will, in shaping appropriate relief, not be limited by the relief requested by plaintiff." *Tex. Instruments Inc. v. Tandy Corp.*, 1992 WL 103772, at *6 (Del. Ch. May 12, 1992) (Allen, C.). "Unlike its extinct English ancestor, the High Court of Chancery of Great Britain, Delaware's Court of Chancery has never become so bound by procedural technicalities and restrictive legal doctrines that it has failed the fundamental purpose of an equity court—to provide relief suited to the circumstances when no other remedy is available at law." William T. Quillen & Michael Hanrahan, *A Short History of the Delaware Court of Chancery: 1792–1992*, *in* Court of Chancery of the State of Delaware: 1792–1992 21, 22 (1992).

"When equity takes jurisdiction of a cause and decides that relief shall be granted, the relief, including damages, if any, will be tailored to suit the situation as it exists on the date the relief is granted and the choice of relief is largely a matter of discretion with the trial judge." *Guarantee Bank v. Magness Constr. Co.*, 462 A.2d 405, 409 (Del. 1983) (holding that the Court of Chancery did not err in awarding a remedy that diverged from the parties' stipulated facts).

> Fundamentally, once a right to relief in Chancery has been determined to exist, the powers of the Court are broad and the means flexible to shape and adjust the precise relief to be granted so as to enforce particular rights and liabilities legitimately connected with the subject matter of the action. It is

33

> necessary for the Court to adapt the relief granted to the requirements of the case so as to give to the parties that to which they are entitled.

*Wilmont Homes, Inc. v. Weiler*, 202 A.2d 576, 580 (Del. 1964) (citations omitted). "The choice of relief to be accorded a prevailing plaintiff in equity is largely a matter of discretion with the Chancellor, and Delaware, with its long history of common law equity jurisprudence, has followed that tradition." *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 500 (Del. 1981) (citations omitted), *overruled on other grounds*, *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983).

These principles apply when a court confronts facts that ordinarily would give rise to a derivative recovery, but where the plaintiff has standing to pursue a remedy by way of a direct challenge to a merger. The recovery in a derivative action generally goes to the

injured entity,[10] but that rule is not absolute.[11] Treatise authors[12] and commentators[13] have

_____

[10] *See*, *e.g.*, 13 Fletcher Cyclopedia of Corporations § 6028, at 323 (rev. ed. 2013) ("Any recovery in a derivative proceeding generally belongs to the corporation and not to the plaintiffs or other shareholders."); Robert C. Clark, *Corporation Law* § 15.1, at 639 (1986) ("Ordinarily . . . any damages recovered in the suit are paid to the corporation.").

[11] *Eshleman v. Keenan*, 194 A. 40, 43 (Del. Ch. 1937) (Wolcott, C.) (endorsing and applying general rule of an entity-level recovery where a derivative claim is brought on behalf of a profitable corporation operating as a going concern, but positing that circumstances could support a *pro rata* recovery, such as if "the corporation had ceased to operate, its controlling stockholder had converted all of its assets and it was denuded of all of its property"), *aff'd*, 2 A.2d 904, 912 (Del. 1938) (affirming general rule of entity-level recovery while allowing for possibility of *pro rata* recovery in "exceptional cases"); *see also In re Cencom Cable Income P'rs, L.P. Litig.*, 2000 WL 130629, at *1–3 (Del. Ch. Jan. 27, 2000) (permitting individual recovery by limited partner where partnership had dissolved and "superimposing derivative pleading requirements upon claims needlessly delays ultimate substantive resolution and serves no useful or meaningful public policy purpose"); *Fischer v. Fischer*, 1999 WL 1032768, at *1, 3 (Del. Ch. Nov. 4, 1999) (permitting individual recovery on overpayment claim and waste claim where defendants were also stockholders such that an entity-level recovery would put the plaintiff in the "awkward position" of requesting relief that would benefit the defendants); *In re Gaylord Container Corp. S'holders Litig.*, 747 A.2d 71, 82 (Del. Ch. 1999) (recognizing that the adoption of a rights plan would affect different types of stockholders differently and suggesting that characterizing the claim as derivative could prevent the stockholders who were also defendants from benefitting from their wrongdoing by "awarding relief to the class of innocent stockholders"); *Boyer v. Wilm. Mat'ls, Inc.,* 754 A.2d 881, 903 (Del. Ch. 1999) (permitting individual recovery where majority stockholders purchased corporate assets for inadequate consideration and continued business to exclusion of minority stockholder). *See generally* Kurt M. Heyman & Patricia L. Enerio, *The Disappearing Distinction Between Derivative And Direct Claims*, 4 Del. L. Rev. 155, 178–85 (2001) (discussing implications of Delaware cases that contemplated individual recoveries on claims traditionally viewed as derivative).

[12] *See*, *e.g.*, Henry Winthrop Ballantine*, Ballantine on Corporations* § 143, at 336 (rev. ed. 1946) ("In certain situations recovery may be allowed by the plaintiff of his individual damages in a representative suit on a corporate right of action in lieu of the corporate recovery."); 3A Fletcher Cyclopedia of Corporations § 1342, at 577 (rev. ed. 2013) ("The decree may, in a proper case, order payment directly to the complaining shareholder or creditor, but ordinarily, where the right to recover is as the representative of the corporation, the damages should be ordered paid to the corporation."); Ernest L. Folk,

III, *The Delaware General Corporation Law: A Commentary and Analysis* 455 (1972) ("It is true that 'exceptional cases' may arise where it is equitable to enforce recovery against the wrongdoing defendants 'in an amount sufficient to satisfy non-assenting stockholders measured by their stockholdings.'" (quoting *Eshleman*, 2 A.2d at 912)); William J. Grange, *Corporation Law for Officers and Directors* 328–29 (5th ed. 1946) ("[I]n some exceptional cases, . . . the court may order the money or property recovered distributed directly to the stockholders in proportion to their holdings."); 2 George D. Hornstein, *Corporation Law & Practice* § 602, at 101 (1959) (citing examples where court gave an individual recovery to stockholders on a derivative claim and concluding that "[t]he moral to be drawn from these exceptions to the general rule is that treatment of the corporation as a separate legal entity will not be permitted if it will interfere with the court's doing justice to human beings"); Christine Rohrlich, *Law and Practice in Corporate Control* 146–47 (1933) ("Under exceptional circumstances the plaintiffs may receive directly their proportionate interest in any recovery which would ordinarily go to the corporation."); Robert S. Stevens, *Handbook on the Law of Private Corporations* § 162, at 662 (1936) ("The third class of cases in which a shareholder may recover his individual loss includes those . . . though the injury is one which may be termed corporate, the courts have, in fixing the amount of recovery, looked at the realities of the corporate structure, and have protected those shareholders who have been actually injured and were deserving of reimbursement."); 6 Seymour D. Thompson & Joseph W. Thompson, *Commentaries on the Law of Corporations* § 4571, at 466 (3d ed. 1927) ("Where, however, in awarding recovery to the corporation it would result in stockholder receiving a portion thereof to which he was not entitled, a court of equity may look beyond the corporation and decree the recovery to those stockholders entitled to it.").

[13] *See*, *e.g.*, Richard A. Booth, *A Note On Individual Recovery In Derivative Suits*, 16 Pepp. L. Rev. 1025, 1025 (1989) ("There have been . . . a few important cases in which the courts have held that it is the individual shareholders who may recover."); Gail Gutsein, *Railroad May Prosecute Corporate Cause of Action, Despite Lack of Stockholder Injury, to Vindicate Public Interest*, 74 Colum. L. Rev. 528, 530 n.11 (1974) ("This [*pro rata*] approach, while not unique, is rejected in the vast majority of cases."); Mary Elizabeth Matthews, *Derivative Suits and the Similarly Situated Shareholder Requirement*, 8 DePaul Bus. L.J. 1, 1 n.1 (1995) ("[R]ecovery may be awarded to the shareholders pro rata in limited instances."); John W. Welch, *Shareholder Individual and Derivative Actions: Underlying Rationales and the Closely Held Corporation*, 9 J. Corp. L. 147, 181 (1984) ("[I]in a few cases, courts have ordered that the judgment be paid directly to the shareholders, even while reaffirming the derivative nature of the proceeding."); Barbara E. Bruce, Note, *Equitable Principles Applicable To The Issue Of Standing*, 16 B.C. Indus. & Comm. L. Rev. 525, 536 (1974) ("There are a number of cases where pro-rata recovery has been awarded because the circumstances dictate that to do otherwise would be inequitable."); Note, *Equitable Considerations in Suits by Corporations Against Former*

recognized that courts will grant *pro rata* recoveries where the equities demand it. Indeed,

one of the earliest English cases to recognize the viability of a derivative claim rejected the

contention that an individual recovery would never be permitted:

> If a case should arise of injury to a corporation by some of its members, for which no adequate remedy remained, except that of a suit by individual [stockholders] in their private characters, and asking in such character the protection of those rights to which in their corporate character they were entitled, I cannot but think that the . . . claims of justice would be found superior to any difficulties arising out of technical rules respecting the mode in which corporations are required to sue.

*Foss v. Harbottle*, 67 Eng. Rep. 189, 202 (Ch. 1843). *See generally* Raoul Berger,

*"Disregarding The Corporate Entity" For The Stockholders' Benefit*, 55 Colum. L. Rev.

---

*Controlling Shareholders*, 88 Harv. L. Rev. 227, 231 (1974) ("Courts have created exceptions to the rule" that "minority shareholders cannot obtain pro rata recovery on a corporate cause of action."); Note, *Personal Recovery By Shareholders For Injury To The Corporation*, 2 U. Chi. L. Rev. 317, 321 (1935) [hereinafter Personal Recovery] ("In some circumstances . . . , courts have granted recovery to a shareholder *in lieu of* corporate recovery."); Note, *Situations Where Pro Rata Recovery Is Granted*, 69 Harv. L. Rev. 1314, 1314 (1956) [hereinafter Situations] ("In certain circumstances, however, some courts have given the recovery in derivative suits to individual stockholders."); *id.* at 1319 (describing the view that individual relief can never be awarded on a derivative claim as "unduly restrictive" but recommending that "courts should proceed cautiously in decreeing pro rata recovery"); *cf.* Edward J. Grenier, *Prorata Recovery by Shareholders on Corporate Causes of Action as a Means of Achieving Corporate Justice*, 19 Wash. & Lee L. Rev. 165, 201 (1962) ("[P]rorata recovery, under certain circumstances, provides a useful and desirable method for redressing wrongs to the corporation. Through it, the derivative suit is likely to become a far more refined instrument for achieving corporate justice."); William D. Harrington, *Business Associations*, 42 Syracuse L. Rev. 299, 339 (1991) ("Justice would have been better served if the court had adopted the pro rata recovery rule, or at least taken more trouble to explain why it was rejecting it."); Comment, *Corporations—Shareholders' Derivative and Direct Actions—Individual Recovery*, 35 N.C. L. Rev. 279, 284 (1957) [hereinafter Individual Recovery] ("From the above, it can be seen that courts have refused to be restrained by lack of precedents where inequitable results would be reached if they followed the general rule [of only permitting an entity-level recovery].").

808 (1955). The rule requiring the corporation to sue and receive the recovery "must always yield to the requirements of equity, and is cast aside in view of the fact that the stockholders are the real beneficiaries *whenever the usual course is not open.*" *Home Fire Ins. Co. v. Barber*, 93 N.W. 1024, 1033 (Neb. 1903) (Pound, C.) (emphasis added).

Because a claim for breach of fiduciary duty is fundamentally a creature of equity, the court has the power to craft a remedy that is appropriate based on the specific facts and equities of the case.[14] For a derivative claim, that most often means a corporate remedy, but not always. Seeking to generalize from the various precedents, commentators have identified recurring scenarios that can support an investor-level recovery on an entity-level claim.[15]

---

[14] *See Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.*, 817 A.2d 160, 176 (Del. 2002) ("[T]he Court of Chancery's 'powers are complete to fashion any form of equitable and monetary relief as may be appropriate.'"); *Hanby v. Wereschak*, 207 A.2d 369, 370 (Del. 1965) ("[T]he Court of Chancery [has] the inherent powers of equity to adapt its relief to the particular rights and liabilities of each party . . . .").

[15] Different commentators group the cases differently. *See*, *e.g.*, 13 Fletcher, *supra*, § 6028, at 325 (identifying six recurring fact patterns in which "[c]ourts have been willing to award a pro rata recovery to shareholders"); Grenier, *supra*, at 167 (identifying four typical scenarios in which "prorata recovery on a corporate cause of action has been decreed); Bruce, *supra*, at 536 n.79 (identifying "three fact situations predominantly involved" in opinions where *pro rata* recovery has been ordered); Individual Recovery, *supra*, at 280 ("[I]n at least two general classes of cases, the shareholder has been allowed to recovery directly."); Situations, *supra*, at 1314 (observing that "[c]ourts have decreed pro rata recovery in three principal situations").

- Cases where the defendants are insiders who misappropriated corporate property such that an entity-level recovery would return the property to the wrongdoers' control.[16]

---

[16] 13 Fletcher, *supra*, § 6028, at 325 ("when the defendants hold a controlling interest in the corporation"); Grenier, *supra*, at 167 ("to protect shareholders from dissipation of a corporate recovery because of foreseeable future mismanagement by the defendants, who will remain in control of the corporate affairs"); Bruce, *supra*, at 536 n.79 ("when the corporate action is against insiders who have appropriated funds in order to prevent funds disgorged from the wrongdoers from reverting to their control"); Individual Recovery, *supra*, at 280 (noting that where insiders have misappropriated funds, individual recovery by non-participating stockholders has been allowed); Situations, *supra*, at 1314 ("Where the derivative action is against insiders who have appropriated corporate funds, courts have sometimes decreed individual awards to prevent the funds disgorged by the wrongdoers from reverting to their control.").

For illustrative Delaware cases, see *Cencom*, 2000 WL 130629, at *5–6 (permitting direct challenge to transaction in which general partner purchased assets of limited partnership, then caused entity to dissolve); *Boyer*, 754 A.2d at 903 (crediting plaintiff's argument that he suffered individual injury and could sue directly where an insider transfer left the plaintiff "with his 25% interest in WMI, a worthless company, while defendants purchased the hot mix plant at an unfair price and simply continued WMI's business at a new location under a new corporate name"); *Fischer*, 1999 WL 1032768, at *1, *3–4 (permitting individual recovery where defendants controlled entity, sold key asset to themselves in return for cash and a note, distributed the cash, and then caused the entity not to pursue recovery on the note). *See also Stevanov v. O'Connor*, 2009 WL 1059640 at *6 (Del. Ch. Apr. 21, 2009) (denying motion to dismiss because it was reasonably conceivable that plaintiff could prove individual injury based on insider transfers). *See generally* Heyman & Enerio, *supra*, at 181–83 (describing a possible "unjust enrichment exception" under which "plaintiffs could pursue direct claims, rather than derivative claims, in order to exclude the defendants from the group of persons entitled to any recovery").

For illustrative cases from other jurisdictions, see *Perlman v. Feldmann*, 219 F.2d 173 (2d Cir. 1955) (awarding individual recovery to minority stockholders where former controller and principal officer sold his control block in transaction that was held to constitute a breach of duty and where corporate recovery would result in greater total liability and permit culpable parties to benefit), *cert denied*, 349 U.S. 952 (1955); *Rankin v. Frebank Co.,* 121 Cal. Rptr. 348 (Cal. Ct. App. 1975) (awarding *pro rata* recovery in suit involving misappropriation of corporate opportunity); *Holi-Rest, Inc. v. Treloar*, 217 N.W.2d 517 (Iowa 1974) (incorporating individual recovery for minority stockholder into

- Cases where an entity-level recovery would benefit "guilty" stockholders, but an investor-level recovery could be more narrowly tailored to benefit only "innocent" stockholders.[17]

---

remedy awarded in derivative action challenging controller's extraction of excessive salaries and loans from corporation as well as other self-dealing transactions); *Matthews v. Headley Chocolate Co.*, 100 A. 645 (Md. 1917) (awarding *pro rata* recovery to minority stockholders in derivative suit where controlling stockholders caused the corporation to pay themselves excessive salaries, then sold their control block to a new buyer); *Di Tomasso v. Loverro*, 293 N.Y.S. 912 (N.Y. App. Div. 1937), *aff'd*, 12 N.E.2d 570 (N.Y. 1937) (per curiam) (awarding *pro rata* recovery to minority stockholder after directors conspired with competition); *Alexander v. Quality Leather Goods Corp.*, 269 N.Y.S. 499 (N.Y. Sup. Ct. 1934) (permitting minority stockholder to recover individually where corporation was dissolved, all creditors had been paid, and court could identify party who should benefit from judgment); *Joyce v. Congdon*, 195 P. 29 (Wash. 1921) (ordering *pro rata* award to minority in derivative suit challenging transaction in which corporation purchased stock with corporate funds then distributed shares to majority holders); *see also Jones v. Mo. Edison Elec. Co.*, 144 F. 765 (8th Cir. 1906) (explaining that trial court could award *pro rata* recovery in self-dealing transaction); *Backus v. Finkelstein*, 23 F.2d 357 (D. Minn. 1927) (ordering *pro rata* recovery where the defendants took excessive salaries, kept inadequate records, and used the corporation's credit for their own benefit); *Fougeray v. Cord*, 24 A. 499 (N.J. Ch. 1892) (ordering dividend paid to innocent stockholder), *rev'd on other grounds sub nom.*, *Laurel Springs Land Co. v. Fougeray*, 26 A. 886 (N.J. 1892) (directing payment of reasonable dividend); *Hyde Park Terrace Co. v. Jackson Bros. Realty Co.*, 146 N.Y.S. 1037 (N.Y. App. Div. 1914) (awarding *pro rata* recovery where defendants usurped payments directed towards company); *Von Au v. Magenheimer*, 110 N.Y.S. 629 (N.Y. App. Div. 1908) (permitting individual suit by stockholder where defendants took excessive salaries, refused to pay dividends, and committed waste as part of a successful attempt to induce plaintiff to sell shares), *aff'd*, 89 N.E. 1114 (N.Y. 1909); *Dill v. Johnston*, 179 P. 608 (Okla. 1919) (awarding *pro rata* recovery after majority stockholder converted assets for personal use); *Easton v Robinson*, 31 A. 1058 (R.I. 1895) (per curiam) (ordering *pro rata* recovery where majority stockholders, who were also directors, voted themselves excessive salaries); *Nichols v. Olivia Veneer Co.*, 246 P. 941 (Wash. 1926) (awarding *pro rata* distributions when some stockholders received excessive salaries); *Chounis v. Laing*, 23 S.E.2d 628 (W. Va. 1942) (awarding *pro rata* recovery for dissenting stockholders and not for the stockholders who voted in favor of challenged transaction); *Jenkins v. Bradley*, 80 N.W. 1025 (Wis. 1899) (directing *pro rata* recovery because other stockholders settled with company).

[17] 13 Fletcher, *supra*, § 6028, at 325 ("where corporate recovery would benefit shareholders who participated or acquiesced in the wrongdoing"); Grenier, *supra*, at 167

- Cases where the entity is no longer an independent going concern, such that channeling the recovery through the corporation is no longer feasible or a *pro rata* recovery is more efficient.[18]

---

("to limit recovery to 'innocent' shareholders"); Bruce, *supra*, at 536 n.79 ("where 'guilty' and 'innocent' stockholders would benefit by corporate recovery"); Situations, *supra*, at 1314 ("Where there are 'innocent' and 'guilty' stockholders, [courts] have occasionally employed individual awards to limit recovery to the 'innocent' ones.").

For illustrative cases, see *Perlman*, 219 F.2d at 177–78 (excluding from investor-level recovery stockholders who gained from the fruits of the wrongful act); *Atkinson v. Marquart*, 541 P.2d 556 (Ariz. 1975) (en banc) (awarding individual recovery to one stockholder for a breach of fiduciary duty by the other stockholder); *Rankin*, 121 Cal. Rptr. at 362 (awarding *pro rata* recovery where defendant misappropriated corporate assets); *Brown v. De Young*, 47 N.E. 863 (Ill. 1897) (excluding from recovery stockholders who participated in fraud); *Samia v. Cent. Oil Co. of Worcester*, 158 N.E.2d 469 (Mass. 1959) (directing forced sale of wrongdoers' equity to prevent unjust enrichment); *Harris v. Rogers*, 179 N.Y.S. 799 (N.Y. App. Ct. 1919) (ordering *pro rata* award to plaintiff because other stockholders acquired stock from culpable parties); *Ritchie v. People's Tel. Co.*, 119 N.W. 990 (S.D. 1909) (ordering dividend distributions to innocent stockholders until wrongdoer repaid the corporation for misappropriated funds); *Joyce*, 195 P. at 30 (ordering *pro rata* recovery although defendant was innocent but purchased stock from wrongdoers); *Chaunis v. Laing*, 23 S.E.2d 628 (W. Va. 1942) (excluding from recovery stockholders who settled separately with defendants); *Young v. Colum. Oil Co. of W. Va.*, 158 S.E. 678, 685 (W. Va. 1931) (awarding *pro rata* recovery after defendant directors usurped corporate opportunity); *Spaulding v. N. Milwaukee Town Site Co.*, 81 N.W. 1064 (Wis. 1900) (excluding from recovery stockholders who settled separately with defendants).

For a Delaware case suggesting a similar approach, see *Gaylord Container*, 747 A.2d at 82 (recognizing that the adoption of a rights plan would affect different types of stockholders differently and suggesting that characterizing the claim as derivative could prevent the defendants who were also stockholders from benefitting from their wrongdoing by "awarding relief to the class of innocent stockholders").

[18] 13 Fletcher, *supra*, § 6028, at 325 ("where the corporation has ceased doing business and direct recovery would facilitate the distribution of assets"); Berger, *supra*, at 820 (noting that cases have permitted individual stockholders to sue directly, rather than derivatively, after a corporation has been dissolved, "indicat[ing] judicial awareness of the need for a stockholders' suit when the corporation is unable to sue"); Grenier, *supra*, at 167 ("to provide a convenient method for ultimate distribution when the corporation is in liquidation or when its assets have been sold"); Bruce, *supra*, at 536 n.79 ("where the

corporation is no longer a viable concern"); Situations, *supra*, at 1314 ("[W]here the corporation is no longer a going concern, [courts] have allowed individual awards to facilitate distribution of the funds.").

For illustrative Delaware cases, see *Cencom*, 2000 WL 130629, at *5–6 (classifying claim as direct in part because of liquidation of partnership); *Fischer*, 1999 WL 1032768, at *3–4 (classifying claim as direct in part because of liquidation of corporation); *Abelow v. Symonds*, 156 A.2d 416, 420 (Del. Ch. 1959) ("I am not convinced that plaintiffs should be summarily denied the right to couch their complaint in terms which seek a remedy for alleged personal injury to a class of stockholders as opposed to the theoretical injury to a now dissolved corporate entity."); *Eshleman*, 194 A. at 43 (positing that circumstances could support a *pro rata* recovery, such as if "the corporation had ceased to operate, its controlling stockholder had converted all of its assets and it was denuded of all of its property"). *See generally* Heyman & Enerio, *supra*, at 178–81 (positing the re-discovery of a "liquidation exception" under which investors could sue directly once an entity had liquidated or was in the process of liquidating and was distributing its assets to its equity holders).

For illustrative non-Delaware cases involving dissolution, see *May v. Midwest Refin. Co.*, 121 F.2d 431 (1st Cir. 1941) (limiting relief to plaintiffs after directors engaged in fraud while liquidating company), *cert. denied*, 314 U.S. 668 (1941); *Am. Seating Co. v. Bullard*, 290 F. 896 (6th Cir. 1923) (affirming trial court decision to award plaintiffs an interest in wrongfully transferred property); *Ervin v. Or. Ry. & Nav. Co.*, 20 F. 577 (C.C.S.D.N.Y. 1884) (awarding *pro rata* relief to minority stockholders of dissolved corporation where majority directors engaged in self-dealing transactions); *Ward v. Graham-Jones Motor Co.*, 219 P. 776 (Colo. 1923) (allowing direct suit where former stockholder of dissolved corporation showed directors engaged in pre-dissolution fraud); *Geltman v. Levy*, 207 N.Y.S.2d 366 (N.Y. App. Div. 1960) (denying motion to dismiss where plaintiffs sought *pro rata* recovery after company was liquidated because defendant misappropriated corporate assets); *Alexander*, 269 N.Y.S. at 503–04 (ordering *pro rata* recovery where director-stockholders engaged in fraud in connection with dissolution of company); *Sale v. Ambler*, 6 A.2d 519 (Pa. 1939) (granting direct recovery to plaintiff when directors of dissolved company misappropriated corporate funds); *Bailey v. Jacobs*, 189 A. 320 (Pa. 1937) (granting direct payment to plaintiffs for liquidated but undissolved corporation); *Commonwealth Title Ins. & Tr. Co. v. Seltzer*, 76 A. 77 (Pa. 1910) (permitting stockholders to pursue an individual recovery involving assets of an undissolved corporation in liquidation); *Kingsbury v. Phillips*, 142 S.W. 73 (Tex. Civ. App. 1911) (granting plaintiffs right to pursue as direct claims that would otherwise be derivative after directors of dissolved corporation misappropriated corporate assets).

In considering whether to grant a *pro rata* recovery, courts also consider the rights of parties having a higher priority in the capital structure, such as creditors.[19] "The ultimate

---

For illustrative non-Delaware cases involving mergers, see *Watson v. Button*, 235 F.2d 235 (9th Cir. 1956) (affirming award of *pro rata* recovery when defendant had embezzled funds in connection with a sale of all the company's stock); *Kirk v. First Nat'l Bank of Columbus*, 439 F.Supp. 1141 (M.D. Ga. 1977) (permitting stockholders of merged corporation to bring post-closing suit based on undiscovered pre-transaction breach of fiduciary by corporate president as a direct claim); *DeHaas v. Empire Petroleum Co.*, 300 F.Supp. 834 (D. Colo. 1969) (ordering equitable lien on post-merger corporation for benefit of stockholders of acquired company after finding liability under Rule 10b-5), *rev'd on other grounds*, 435 F.2d 1223 (10th Cir. 1970) (noting "we consider plaintiff's stock interest to be the practical equivalent of record stock and sufficient to satisfy the requirements of Rule 23.1(1)"); *Gertsle v. Gamble-Skogmo, Inc.*, 298 F.Supp. 66 (E.D.N.Y. 1969) (limiting award to stockholders of acquired company injured by misleading statements in proxy), *modified on other grounds*, 478 F.2d 1281 (2nd Cir. 1973); *Miller v. Steinbach*, 268 F.Supp. 255 (S.D.N.Y. 1967) (permitting derivative action brought under federal securities laws against the corporation's officers and directors to continue after a merger as an individual action with the possibility of a *pro rata* recovery); *Atkinson*, 541 P.2d at 559 (permitting direct suit by stockholder of dissolved corporation); *Gabhart v. Gabhart*, 370 N.E.2d 345 (Ind. 1977) (ruling that "a Court of Equity may grant relief, pro-rata, to a former shareholder, of a merged corporation, whose equity was adversely affected by the fraudulent act of an officer or director and whose means of redress otherwise would be cut off by the merger"); *Indep. Inv. Protective League v. Time, Inc.*, 412 N.Y.S.2d 898 (N.Y. App. Div. 1979) (permitting former stockholders of merged corporation to pursue claim for pre-merger mismanagement relating to issuance of stock as a post-closing direct claim brought on behalf of former corporation's stockholders); *Platt Corp. v. Platt*, 249 N.Y.S.2d 75 (N.Y. App. Div. 1964) (refusing to hold that derivative claims for breach of fiduciary duty were "obliterated by the merger of the wronged corporation into another corporation" and permitting the claims to be litigated as a direct action), *aff'd*, 204 N.E.2d 495 (N.Y. 1965). *See also Duffy v. Cross Country Indus., Inc.*, 395 N.Y.S.2d 852, 853 (N.Y. App. Div. 1977) ("[T]he cause of action that [plaintiff] would have against its officers and directors for self-dealing and corporate waste would survive the merger . . . .").

[19] *See, e.g.*, Berger, *supra*, at 823 ("The objection remains that individual stockholders' actions may deprive corporate creditors of protection [but] [i]n the absence of creditors, that objection should carry no weight."); Individual Recovery, *supra*, at 283 ("The real objection to permitting a shareholder to recover directly for his proportionate

problem before the courts is how to protect the interests of all the parties involved: the corporation, its creditors and its shareholders." Individual Recovery, *supra*, at 284. A *pro rata* recovery can be "the most effective technique for dealing with the parties' varying equities." Booth, *supra*, at 1025 n.4 (quoting W. Cary & M. Eisenberg, *Cases & Materials on Corporations* 905 (5th ed. 1980)). If a court decides to grant an investor level recovery, then "[e]ach stockholder's award is computed by multiplying the sum which the corporation would have received had individual recovery not been allowed by the ratio of that stockholder's shares to the total number of shares outstanding." Situations, *supra*, at 1314.

Notably, courts at times have granted *pro rata* recoveries in derivative actions at the request of the defendants, who thereby could pay less in terms of the aggregate amount of damages.[20] In Delaware, defendants frequently use a variant of this approach to settle derivative actions in exchange for some form of stockholder-level consideration, such as either a dividend to stockholders or a buyout to the minority. Examples include:

share of the damage inflicted upon the corporation . . . [is] that the result of such recovery is a return of corporate assets to shareholders without first satisfying corporate creditors.").

[20] *See, e.g.*, *De Young*, 47 N.E. at 865 (noting defendant's request that relief should be limited to non-assenting stockholders); *Headley Chocolate*, 100 A. at 651 (explaining that it would not be fair to require defendants to pay back full amount to corporation); *Shanik v. Empire Power Corp.*, 58 N.Y.S.2d 176, 181–82 (N.Y. Sup. Ct. 1945) (noting that it would award proportionate recovery consistent with "defendants' plea that a decree be moulded consonant with the true equities"); *Joyce*, 195 P. at 30 (stating that the plaintiff complained that the recovery was to him personally and not the corporation); Personal Recovery, *supra*, at 321. *Cf. Eshleman*, 194 A. at 43–44 (rejecting request by defendants for an individual recovery that would reduce their aggregate liability).

- *Baker v. Sadiq.* Minority stockholders sued derivatively on behalf of NavSeeker, Inc., contending that NavSeeker's controlling stockholder, HIMEX Limited, misappropriated assets from NavSeeker worth approximately $25 million that effectively constituted NavSeeker's entire business. The parties reached a settlement in which (i) the defendants made a cash payment to NavSeeker in the amount of $2,750,000 for the purpose of buying out the minority stockholders and (ii) HIMEX discharged $500,000 of NavSeeker's debt. The minority stockholders owned approximately 10.75% of NavSeeker's equity. Had they prevailed at trial, they would have benefited indirectly to the tune of $2,687,5000 from a corporate level recovery. The court approved the settlement, explaining that through the stockholder-level recovery, the minority investors received comparable consideration directly. *Baker v. Sadiq*, 2016 WL 4375250, at *4–5 (Del. Ch. Aug. 16, 2016).

- *In re Clear Channel Outdoor Holdings, Inc. Derivative Litigation.* The plaintiffs sued derivatively, claiming that the parent company of the nominal defendant caused the nominal defendant, pre-IPO, to loan the parent money on excessively favorable terms. Post-IPO, the loan balance continued to grow while the parent company's credit rating decreased. The complaint attacked the defendants' actions in approving the initial loan and allowing the loan balance to balloon. The defendants formed a special litigation committee under *Zapata Corp. v. Maldonado*, 430 A.2d 779 (Del. 1981), evidencing their view that the claims were derivative. The case was settled by, among other things, having the parent make a partial repayment of $200 million combined with a dividend in the same amount to the stockholders. Then-Chancellor Strine approved the settlement, noting "[i]t's a derivative action, which is actually, if you think about it, a form of class action" and that "the dividend feature of it, the reduction of the outstanding amount [of the loan] plus the dividend out, in particular to the public stockholders, is a substantial benefit." *In re Clear Channel Outdoor Hldgs., Inc. Deriv. Litig.*, Consol. C.A. No. 7315, at 35, 38 (Del. Ch. Sept. 9, 2013) (TRANSCRIPT).

- *Davis v. Holmes.* The plaintiffs claimed that the defendants violated their fiduciary duties to the nominal defendant corporation by (i) operating the corporation as an unregistered investment company, (ii) paying excessive compensation, (iii) selling substantially all of the corporation's assets, and (iv) engaging in self-dealing. The settlement included the creation of a $3.2 million fund that was distributed to the corporation's unaffiliated stockholders. Vice Chancellor Lamb approved the settlement, observing that the claim was "really a derivative claim" but that the pass-through structure was a "very favorable outcome." *Davis v. Holmes*, C.A. No. 638, at 23 (Del. Ch. June 21, 2006) (TRANSCRIPT).

- *In re Freeport-McMoRan Copper & Gold Inc. Derivative Litigation.* The plaintiffs sued derivatively, claiming that the members of the board of directors of the nominal

defendant corporation caused the entity to overpay to acquire a company in which the directors had an interest. The defendants moved to dismiss pursuant to Rule 23.1, evidencing their view that the claims were derivative. While those motions were pending, the parties settled for consideration consisting principally of a gross settlement fund of $137.5 million plus interest that was paid directly to the corporation's stockholders as a special dividend. Vice Chancellor Noble approved the settlement. *See In re Freeport-McMoRan Copper & Gold Inc. Deriv. Litig.*, Consol. C.A. No. 8145-VCN (Del. Ch. Apr. 7, 2015) (TRANSCRIPT).

- *Franklin Balance Sheet Investment Fund v. Crowley*. The plaintiffs challenged the defendants' practice of having the nominal defendant entity pay premiums for split-dollar life insurance policies that were owned by the entity's controlling stockholder. The defendants moved to dismiss, relying on derivative standing doctrines such as the continuous ownership requirement and the failure to make demand. *See Franklin Balance Sheet Inv. Fund v. Crowley*, 2006 WL 3095952, at *2 (Del. Ch. Oct. 19, 2006) (reciting procedural history). The case was settled by having the controlling stockholder take the nominal defendant private. *Franklin Balance Sheet Inv. Fund v. Crowley*, 2007 WL 2495018, at *1 (Del. Ch. Aug. 30, 2007). Only the stockholders who owned stock at the time of the going-private transaction, not those who held stock at the time of the alleged wrongs, received the benefit of the settlement. *Id.* at *5 n.8. The minority stockholders thus received a remedy for a derivative claim that consisted of their *pro rata* share of the value of the corporation, including some value attributed to the derivative claim. Vice Chancellor Parsons approved the settlement. *Id.* at *1.

- *Gerber v. EPE Holdings, LLC*. This settlement resolved two actions. In the first action, the plaintiffs asserted a derivative claim for breach of fiduciary duty arising out of the nominal defendant's acquisition of a related party. In the second action, the plaintiffs asserted direct and double derivative claims after the defendants agreed to a merger that failed to compensate the plaintiffs for their extinguished derivative claims. Both cases were settled in exchange for a direct payment by the defendants to those investors who held units at the time of the merger. Vice Chancellor Noble approved the settlement. *See Gerber v. EPE Hldgs. LLC*, C.A. Nos. 5989 & 3543 (Del. Ch. July 1, 2014) (TRANSCRIPT).

These and other illustrative settlements[21] demonstrate that the functional and equitable

equivalent of an entity-level recovery can be an investor-level recovery in which the injured

---

[21] *See, e.g.*, *The Frederick Hsu Living Tr. v. Oak Hill Cap. P'rs III, L.P.*, C.A. No. 12108-VCL, at 6, 13–15 (Del. Ch. Jan. 5, 2021) (TRANSCRIPT) (approving settlement of

46

investors receive their *pro rata* share of the amount that otherwise would go to the entity. *See generally Baker*, 2016 WL 4375250, at *1 (discussing "the transitive property of entity litigation," which "recognizes that a derivative action that asserts claims for breaches of fiduciary duty or violations of the entity's constitutive documents, and an investor class action that asserts similar theories, while conceptually distinct and doctrinally separate, can be functionally equivalent and, therefore, substitutes").[22]

In this case, the court has the power to recast the remedy of disgorgement that otherwise could have gone to the Company as an investor-level recovery for the putative class. The remedy that the putative class receives can include disgorgement as a component even if the Transaction price was unfair. Assume that the record establishes that the Company's value as a standalone entity exceeded the Transaction price and that Denner nevertheless led the Company into a sale to lock in a near-term gain. If the record demonstrated a valuation that the Board received from one of its investment bankers on

---

derivative claims in which consideration consisted principally of investor-level buyout of minority stockholders); *Lacey v. German Larrea Mota-Velasco*, C.A. No. 11779-VCG, at 8–10 (Del. Ch. Dec. 27, 2018) (TRANSCRIPT) (approving settlement of derivative claims in which consideration consisted principally of $50 million special cash dividend paid only to minority stockholders); *Grimstad v. Melchiorre*, C.A. No. 12782-VCL, at 25–26 (Del. Ch. July 25, 2017) (TRANSCRIPT) (approving settlement of derivative claims in which stockholders received opportunity to exit company by tendering their shares).

[22] Similar, albeit converse, reasoning justifies requiring the corporation to pay a fee award to class counsel when the class claims conferred benefits on all stockholders but did not create a common fund. *See In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d 353, 358 (Del. Ch. 1999); *Richman v. DeVal Aerodynamics Inc.*, 185 A.2d 884, 886 (Del. Ch. 1962).

January 3, 2018, was a responsible estimate, then the court could hold for purposes of calculating damages that the standalone value of the Company was $158.17 per share. As compensatory damages, the class would be entitled to receive the difference between $158.17 per share and the Transaction price of $105 per share. But in addition, if the plaintiff prevailed on the Insider Trading Claims, the putative class would be entitled to receive the $49.7 million profit that Denner secured. The plaintiff might even be able to obtain a rescissory remedy under which damages for the insider trading would be assessed using the remedial price of $158.17 per share, rather than the Transaction price of $105 per share.

In neither situation is it necessary to evaluate whether the value of the disgorgement recovery is material in the context of the Transaction. That inquiry would explore whether the insider trading resulted in harm. Because of the nature of a *Brophy* claim, no showing of harm is required. *Kahn*, 23 A.3d at 837–38; *Primedia*, 67 A.3d at 475. Even without a showing of transactional damages, Denner must disgorge any illicit trading profits.

Count III is not duplicative. It will not be dismissed.

### III.  CONCLUSION

Counts III and IV both state a claim on which relief can be granted. The plaintiff has standing to pursue those claims. The motion to dismiss Counts III and IV is denied.